Ryan Company, Appellant, v. Sanitary District of Chicago, Appellee.

Gen. No. 41,629.

550

Opinion filed February 8, 1943.

HEALY & REID, of Chicago, for appellant.

ERNST BUEHLER and JOHN H. BISHOP, both of Chicago, for appellee.

MR. JUSTICE SCANLAN delivered the opinion of the court.

Assumpsit action tried by the court without a jury. On June 28, 1940, at the close of plaintiff's case, a

judgment for defendant was entered upon all of plaintiff's claims but one. At the close of all of the evidence a second judgment was entered, on December 10, 1940, in favor of defendant as to the remaining claim.

The complaint contained five counts; also an additional count which was an amplification of count II. The claims under count III were settled prior to the trial and that count was dismissed in the first judgment order. That judgment order also determined plaintiff's claims under counts I, II, IV and additional count. The second judgment determined plaintiff's claim under count V. Plaintiff appeals from the two judgments.

No point is made as to the pleadings. On November 26, 1930, plaintiff, The Ryan Company, a corporation, entered into a contract with defendant, The Sanitary District of Chicago, to construct a sewer in Blue Island avenue and in 22d street, of approximately 3,810 lineal feet 17 feet internal width in earth, 6,250 lineal feet 17 feet internal width in full or partial rock, and 1,180 lineal feet 8 feet 6 inches internal width. On February 23, 1931, the preliminary work, such as the shaft, drift tunnel, etc., was done and work was begun on the main sewer. The work proceeded in two directions, east and west, and progressed in both headings until April 13, 1931, when a fire occurred in the tunnel which stopped work for some time. At the time of the fire 595 feet of the sewer had been built; 266 feet in the east heading and 329 feet in the west heading. Before the fire the wood cant method had been used, i.e., the sheeting, bracing and supports were all timber; no steel nor fireproof material was used. Eleven lives were lost and several persons were injured by reason of the fire. In an inquisition held by the coroner there was a verdict in which certain recommendations were made with respect to changes that should be made and precautions that should be taken to safeguard the lives of persons engaged in the construction of all tunnels in Cook county. Because of such recommendations

plaintiff and defendant entered into a supplemental contract, sometimes called "fire contract," on April 30, 1931. The first count of the complaint is based on claims for compensation under that contract, in which plaintiff agrees, among other things not in controversy, to perform the following: "Item One-A, all shafts, slopes and tunnels shall be lined with fireproof material." Item Nine-A provides that plaintiff shall also perform other work considered advisable by the Engineer for protection from fire, and wherever such work is not contemplated in the original contract, plaintiff would be paid therefor in the manner specified in the fire contract. In paragraph 2 of the "fire contract" defendant agrees to furnish plans and specifications and when they are approved by defendant's Chief Engineer the work shall be performed in accordance therewith and under the supervision and to the satisfaction of the Chief Engineer and his duly accredited representatives. In paragraph 4 defendant agrees to pay plaintiff the cost of performing said work on what is known as the "force account" basis, which is set forth in Articles 7 and 8 of the original contract, provided, that before plaintiff incurred any expense under this fire agreement, it will first submit to the Chief Engineer, the price it proposed to pay for materials, supplies, equipment and the number and wages of its employees. Before it began work plaintiff complied with this requirement. Articles 7 and 8 of the original contract contain several provisions, one in the latter part of Article 7 being as follows: ". . . if the extra work done under this contract is of such a nature being distinct from other work being done by said Contractor, that the Engineer can determine the actual cost of the same, then the said Contractor shall receive and the Sanitary District shall pay, in full satisfaction for the same, the actual cost of the work as determined by the Engineer with fifteen per cent added thereto to cover superintendence and use of ordinary tools and for profit." After plaintiff

submitted to the Chief Engineer the prices it proposed to pay for materials, etc., he approved the same and work was started. The shaft was lined with steel. When it came to the work in the tunnel there was considerable discussion as to what the nature of the fire proof material that was to take the place of the timber bracing should be, and it was decided that they should experiment with steel liner plates and ribs. Accordingly, plaintiff ordered a small quantity of plates and ribs and on May 29, 1931, sent a copy of the order to defendant. On June 1, 1931, defendant sent a letter to plaintiff acknowledging receipt of the order and advising plaintiff that the quantities ordered were satisfactory and in line with the decision reached at a conference held in the Chief Engineer's office. The letter then states that it was the understanding that the entire job was in the nature of an experiment to determine the advisability of using steel instead of timber bracing and, therefore, it was not understood that the price stated in the order was agreed upon but the reasonable cost would be determined upon later, taking into account the labor of placing and the progress made, and deducting therefrom the saving due to the timber not used. On July 16, 1931, defendant authorized plaintiff to furnish plates, etc., for 320 lineal feet of tunnel, and on July 28, 1931, authorized the same for another 320 feet. In both these letters it was stated that "The price to be paid for the material furnished shall be determined upon at a later date." On August 13, 1931, defendant wrote plaintiff the following letter, sometimes referred to as "File No. 77":

"PAYMENT

"To be made under the extra work clause of the contract, *with 5% added instead of 15% as specified in the contract*. Payments to be made under this order shall not exceed $100,000.00.

"WORK TO BE DONE AND REMARKS:

"You are hereby authorized to furnish, deliver and place in all tunnel work, all steel plates, and ribs, with

accompanying splice plates, shoes, bolts and nuts, necessary to complete the work under your contract. For the steel plates, ribs, splice plates, shoes, bolts and nuts, you are to receive a price of $0.048 (four and eight-tenths cents) per lb. delivered at the site of the work. [Plaintiff paid .048 cents per pound for the steel plates, etc.] The actual weight of steel for which you are to receive payment shall be the computed weights as determined by the Engineer in charge of the work. From this price per lb. a deduction of 32% shall be made, the percentage consisting of the following parts:—4% for elimination of needle beam, 8% for saving in excavation and 20% for elimination of the wooden cants. This price shall also apply to all steel plates, ribs, splice plates, shoes, bolts and nuts authorized to date and delivered to the site of the work. You are further authorized to make the necessary arrangements for furnishing and delivering the steel plates, ribs, etc., necessary to complete the tunnel work. The amount, size and details of material to be furnished and delivered shall be determined upon only after discussion and agreement with the engineer in charge of the work. It is the intent of this order that all work in connection with the ordering and placing of the steel shall be performed in conjunction with the engineer in charge of the work and that the amount of steel ordered and placed shall be the minimum necessary to conform to careful, safe and economical work.

"The prices as stated herein shall cover all additional expense *resulting from this order to use steel plates and ribs instead of wood,* and no additional payments other than those specified herein will be made because of this change ordered by us." (Italics ours.)

Upon receipt of the foregoing letter plaintiff immediately wrote defendant the following letter:

"With reference to your order of August 13, 1931 covering the furnishing and installation of steel liner plates for supporting the earth in our tunnel construc-

tion under Contract No. 3—West Side Intercepting Sewer, we note that by the terms of said order you deduct from the cost of the steel the various amounts of possible savings which were discussed in our recent conferences, but which were admitted to be merely estimates of possible savings which might or might not be realized in the use of a new and untried method.

"This order, we feel, should follow the terms of our supplemental agreement of April 30, 1931, which provides that we are to receive cost plus fifteen percent for any work, except a few specified items, which we are called upon to perform.

"In view of the recent catastrophe in the tunnel and the public attention which has been drawn to it, we wish, of course, to cooperate in every, way, not only to make the work as safe as possible, but also to avoid the slightest ground for criticism either of the Sanitary District or ourselves. We are, therefore, willing to undertake the work covered by said order and to accept, tentatively, the prices, deductions and terms, of said order, with the understanding that as the work progresses, you and your Engineers will observe and determine whether the theoretical estimated savings actually occur and that if the savings do not actually occur, we will be allowed to review the facts with your Engineers and to revise the prices so that payments under this order will cover actual cost plus fifteen per cent as provided in the supplemental agreement."

Plaintiff then proceeded with the work until about December 15, 1931, when work was suspended for failure of defendant to make the monthly payments to plaintiff in accordance with the terms of the contract. At the time of the suspension 1,951,817 pounds of steel plates, ribs, etc., had been set and a considerable amount of work done. When work was resumed plaintiff proceeded with the same to completion. In its answer defendant states that plaintiff completed the work on June 15, 1935, and that defendant accepted

the same. In the fire contract, Item Two-A provides that "all existing tunnel plant structures located within 100 feet of the construction shaft shall be constructed of fireproof material. This includes removing and replacing with fireproof material all plant structures now in existence within 100 feet of the existing construction shaft at 22nd and Laflin Streets." Under this provision plaintiff was obligated to move the heating plant and it became necessary to employ three additional engineers. The contracts provided that payment should be made in monthly installments as the work progressed upon certificates signed by defendant's Engineer. On October 31, 1931, there became due and payable to plaintiff $124,218.14, for which plaintiff received two certificates signed by the Engineer, one for $113,824.31 and one for $10,393.83; on November 30, 1931, there became due and payable to plaintiff $162,189.25, but none of these amounts was paid. By December 11, 1931, about $75,000 more had accrued and was not paid. On December 11, 1931, plaintiff notified defendant that owing to the nonpayment of the amounts due and payable October 31 and November 30, work would be suspended at the end of the 4-12 shift of December 14, 1931, until further notice, unless said amounts were paid. None was paid and work was suspended December 15, 1931, and was not resumed until March 23, 1934, but plaintiff held itself in readiness to proceed at any time payment was made. On December 22, 1931, plaintiff notified defendant that it had suspended work because of defendant's failure to pay but would hold itself in readiness to resume work on payment. At the same time plaintiff notified defendant that in order to resume work most economically and efficiently, it was necessary to leave plaintiff's equipment and material upon the site and to retain in its employ a superintendent and other members of the job organization; that it was also necessary to protect and safeguard the work in place and the material and equipment at the

site during the period of suspension; that in the performance of the contracts plaintiff had entered into subcontracts for work and material and that by reason of the delay occasioned by such suspension, there might be additional claims and costs; that further delay might result in further damage by reason of possible increased costs for labor and material; that plaintiff would expect and demand full reimbursement and that if defendant had any conflicting views or any other course of procedure to suggest and, particularly, if defendant wished that plaintiff should abandon its purpose of preserving the job organization and retaining the equipment on the site, defendant should so advise plaintiff. Defendant never presented any conflicting views nor advised any other procedure. Again, on February 2, 1932, plaintiff notified defendant to the same effect and defendant remained silent. The defaults continued until March 23, 1934, during which time the equipment and material remained at the site and plaintiff continued to safeguard the work in place and the material and equipment, and was ready, able and willing to resume work and held itself in readiness to do so, upon payment of the money due and payable as aforesaid. The reason given by defendant for its breach of the contracts in failing to make the payments was that it was without funds. It is conceded that defendant had no funds to make said payments because it had used the money raised and appropriated for that purpose for other purposes.

*As to the claim of plaintiff under count I—For balance remaining unpaid under fire contract:*

Plaintiff contends that it "is entitled to the balance remaining unpaid under the terms of the fire contract. The claims are not for 'extras,' " and that the court erred in dismissing count I. Plaintiff states its claim under count I as follows:

"1. The cost of the steel used was agreed upon. But instead of paying plaintiff the cost and adding 15%, defendant arbitrarily deducted 32% and paid

plaintiff only 68% of the cost, plus 5%, instead of 15%. Defendant sought to justify the deduction of 32% on the grounds that the contractor saved that percentage by the non-use of the timber 20%; by the non-use of the needle-beam 4% and for savings in excavation 8%. They nowhere seem to show any reason for paying 5% plus instead of 15%. The facts show that instead of 20%, only 16.92% was saved by the non-use of the timber; nothing by the non-use of the needle-beam. (In fact, plaintiff continued to use the needle-beam.) Not only no savings in excavation but an increase. This part of the claims is for the difference between the 32% withheld and the 16.92% defendant was entitled to withhold, and for the 10% withheld by paying only 5%. This amounts to $36,247.72.

"2. Another part of the claim in Count I is the increase in amount of excavation, 2222 cubic yards, $9,999.00.

"3. By reason of the use of the steel 2431.14 cubic yards of additional concrete was used—$38,898.29.

"4. For the same reason grouting (filling between steel and surrounding earth) became necessary and was ordered—$59,505.86. No grouting was needed nor called for with the timber lining.

"5. By reason of the requirements as to safety and defendant's orders there was additional expense in connection with the heating plant—$6,265.47."

Defendant states its position as to plaintiff's claim under count one as follows: "Plaintiff is not entitled to recover any additional compensation for work done under the contracts of November 26, 1930 and April 30, 1931. 1. The general conditions precedent incorporated in the original contract and the fire contract were not complied with. 2. The special conditions precedent relating to extra work under the original contract and the fire contract have not been complied with. 3. *Pursuant to powers granted by the original contract and the fire contract defendant's Engineer de-*

*cided all claims in controversy between plaintiff and
defendant and his decision thereon is final and binding.*
4. Aside from its noncompliance with conditions pre-
cedent plaintiff has not made out a case on any of the
claims under the other provisions of the original and
fire contracts.'' (Italics ours.)

Defendant states that ''the trial court held that
plaintiff was entitled to no recovery because it had
failed to show compliance with the conditions precedent
to payment contained in the contracts.'' That ''under
the terms of the original contract the work was to be
done under the direction and supervision of the de-
fendant's chief engineer (hereinafter sometimes re-
ferred to as the 'Engineer'). All work was to be paid
for in *monthly installments* as the work progressed,
*upon certificates signed by the Engineer.* At the con-
clusion of the work, plaintiff was entitled to receive
payment only upon compliance with the following ex-
press covenant: 'The Contractor further agrees that
he shall not be entitled to demand or receive final pay-
ment for any portion of the aforesaid work or ma-
terials, except in the manner set forth in this
agreement, *nor until all the stipulations, provisions and
conditions hereinbefore mentioned are complied with,
and the Engineer shall have given his certificate to that
effect.'* The general conditions precedent set forth in
the original contract were incorporated into the fire
contract. Paragraph 7 of the latter contract expressly
continued in effect all conditions, covenants and pro-
visions of the original contract not modified or changed
by the fire contract. . . . Under these contracts,
plaintiff, as a condition precedent to payment for ex-
cavation, concrete, grout, etc., was required to pro-
cure the Engineer's certificate of the amount of work
performed and the value thereof, and a further cer-
tificate of complete compliance with the stipulations,
provisions and conditions of the contracts. *There is
no such proof in this case.*''

Plaintiff insists that defendant's contention 3 disposes of its contentions 1 and 2, and adversely to defendant; that if the Engineer decided all of plaintiff's claims against plaintiff, it would follow that the latter could not obtain from the Engineer a certificate of complete compliance with the stipulations, etc., of the contract, and it would have been useless for it to even ask him for a certificate. That plaintiff's instant point has merit is obvious.

The parties differ as to how the work provided for in the so-called fire contract of April 30, 1931, is to be treated. Defendant contends: "(except for the cost of heating plant engineers) that they are either extras or work specified under the unit prices set forth in the original contract." Plaintiff contends that "all the work required by the fire contract was work distinct from the work required by the original contract. It all pertained to the fireproof method"; that the claims are not for extra work under the original contract but for work that the fire contract, alone, provided for; that this work did not come within the definition or classification of "extra work"; that the original contract contemplated that wooden cant lining and supports were to be used and did not contemplate that steel liner plates and ribs should be used; that "if, under the original contract, defendant had the right to compel plaintiff to abandon the wooden cant method and line with fire proof material, at plaintiff's own expense, why enter into a contract in which defendant agrees to pay the actual cost of lining with fireproof material plus 15%? And why pay what defendant did on the cost of steel?"; that "the very fact that the fire contract was made is a determination by defendant that the work therein provided for was not covered by the original contract." Article 7 of the original contract, upon which defendant relies, pertains to extra work. It expressly provides that as to claims for extra work the written notices and statements are

made "conditions precedent to any recovery on the part of said Contractor for any extra work performed." It seems clear that defendant's insistence that the claims of plaintiff be treated as extra work under the original contract is due to the fact that Article 7 applies only to "extra work performed." That Article, in our opinion, does not apply to the fire contract, which provides that "all shafts, slopes and tunnels shall be lined with fireproof material," and that defendant agrees to pay the contractor the cost of performing that work provided that before the contractor incurs any expense *"under this agreement"* it will first submit to the Chief Engineer prices, etc. The words "under this agreement" refer to the fire contract, which contains no provision requiring certificates, statements or written notices. The statement or information required by the fire contract was furnished by plaintiff and accepted by defendant.

The argument of defendant that when it ordered plaintiff, after the fire, to use a new method of construction instead of the old it merely exercised the right given it by the original contract "to require the adoption of a safe method of construction and the building of a safe structure" and that even if the change caused large additional costs to plaintiff the latter must bear them, is not warranted by the record and is so devoid of equity that it does not appeal to our sense of justice. Defendant concedes in its brief: "After a disastrous fire, and after the fire contract was signed it became necessary to try out a new method of construction." In its letter of August 13, 1931, it ordered plaintiff "to use steel plates and ribs instead of wood." The uncontradicted evidence is that the steel liner plates and ribs were never used in tunnel construction in Chicago prior to the fire in the instant tunnel and that the wooden cant method was used until that fire; that the first time the steel method was used in Chicago was in the instant tunnel. It seems clear,

after an examination of the fire contract, that the work to be done thereunder cannot be treated as extra work under the original contract nor as work specified or contemplated under that contract. As a reason for awarding the additional work under the fire contract to plaintiff that contract recites that the work specified therein is to be done in order to comply with the recommendations of the coroner's jury and that it could only be done with safety and economy by plaintiff "inasmuch as it [plaintiff] is in the exclusive possession of the site of the work and *said new work* is so closely connected with the work already done and to be done under said contract that said work must be done by one Contractor, and *said new work* is of such an emergency character that it should be performed as soon as possible . . . ." (Italics ours.) The fire contract provides that for the performance of the work specified in that contract plaintiff shall be paid "as provided for herein." *A fortiori*, it provides that the work to be done under the fire contract *"was not included in the terms, conditions and covenants of said [original] contract dated November 26, 1930."* It also provides that "the Contractor shall also perform any other work which may be considered advisable by and ordered by the Chief Engineer in the interest of protection of life or property from fire, and *wherever such additional work is for work not contemplated in the original contract, the Contractor will be paid therefor in the manner specified in this agreement."* It further provides that the Sanitary District agrees to furnish plans and specifications in sufficient detail to show the character of *"the additional work to be performed . . .* and said work shall be performed in accordance therewith." (Italics ours.) Other provisions in the fire contract also show that "the additional work specified in this agreement" was not contemplated under the original contract. On September 9, 1931, defendant wrote plaintiff a letter which

contains the following: "As you know, under the present arrangement it is necessary for the Sanitary District to stand considerable additional expense on your work due to the substitution of steel liner plates for wood timbering and bracing, as authorized by the Board."

If defendant's instant argument is sound, why was the fire contract executed? If, under the original contract, it had the right to compel plaintiff to abandon the wooden cant method and to use the fireproof material at plaintiff's expense, why provide in the fire contract that defendant agrees to pay the actual cost of lining with fireproof material plus 15%? And why did defendant make payments to plaintiff on the cost of steel? It is our judgment that the claims of plaintiff under count I cannot be treated as extras under the original contract and that, therefore, the so-called special conditions precedent do not apply to the said claims; nor can they be treated as work specified under the unit prices set forth in the original contract. It is true, as defendant claims, that the bills submitted by plaintiff were designated "extra work bills," or "extra bills resulting from fire," but any classification by plaintiff of its bills would not change nor modify the fact that the claims were for work done and material furnished under the fire contract.

But defendant claims that the Engineer's "File Letter 77" of August 13, 1931, is controlling; that under the original contract he had the authority to bind plaintiff to the provisions in that letter; that the entire cost of the so-called fire construction was fixed by that letter and plaintiff was paid in accordance therewith; that plaintiff undertook the work upon the basis of the terms laid down in the letter and "is now estopped from making any additional claim as to these items." Plaintiff contends that the Engineer, in that letter, made an attempt to change the terms of the fire contract; that plaintiff did not agree to the change in

the terms stated in the letter, nor did it acquiesce in the said terms; that the unconscionable character of the instant contention of defendant clearly appears from the undisputed fact that the steel used in the work cost plaintiff $110,606.31. We cannot agree with defendant's position as to the effect of the letter in question. As we read the letter it is an obvious attempt to change the conditions of the fire contract to the material injury of plaintiff. Indeed, in the first sentence of the letter the following occurs: ". . . with 5% added instead of 15% as specified in the contract." It was the fire contract that provided that the contractor should receive "the actual cost of work as determined by the Engineer with fifteen per cent added thereto to cover superintendence and use of ordinary tools and for profit." We do not think that defendant's claim that plaintiff acquiesced in the terms laid down in "File Letter 77" and that it undertook the work in accordance with said terms, is justified. Plaintiff in its reply to defendant's letter stated that the order should follow the terms of the fire contract and that "payments under this order will cover actual cost plus fifteen percent as provided in the supplemental agreement," and asserted its right to have payments so made. Defendant did not answer plaintiff's letter. Defendant contends that *Michuda v. Sanitary District,* 305 Ill. App. 314, supports its contention that the terms stated in the letter of August 13 govern the instant question. The *Michuda* case was an action for fraud and deceit and it was there held that the charge of fraud and deceit was not proven. There was no additional contract such as is present in the instant case and the contract provided that Michuda should do the work for stated amounts. Neither by the contract nor by any other written agreement did the Sanitary District agree to pay Michuda the cost of the work. Here the Sanitary District entered into a written agreement with plaintiff to pay

the cost plus fifteen per cent and then attempted to change the terms by the "File Letter 77" of August 13. No such situation was present in the *Michuda* case. The contention of defendant that its Engineer had the right under the original contract to change, *at plaintiff's expense,* the method of construction, lacks merit.

As to the five items in plaintiff's claim under count I : We have considered the evidence bearing upon these items and find that they are not for extra work under the original contract, nor for work pertaining to the original contract, that they are for work done under the terms of the fire contract, and that the work was distinct from the work required by the original contract. We conclude, therefore, that plaintiff is entitled to payment for the balance remaining unpaid under the fire contract and that the trial court erred in entering judgment for defendant upon count I.

*As to the claim of plaintiff under count II and additional count—Delay caused by suspension of work:*

Plaintiff contends that it should recover all damages that resulted from the suspension of the work for two and one-third years because the suspension was occasioned by the wrongful acts of defendant, and that the court erred in dismissing plaintiff's complaint as to this claim. We have heretofore stated the facts in reference to the shutdown and the correspondence that took place between the parties in reference to the same. On September 30, 1935, plaintiff presented defendant with bills for the alleged damages incurred as a result of the shutdown and defendant refused to pay the same. When the instant suit was commenced the case of *Underground Construction Co. v. Sanitary District of Chicago,* 367 Ill. 360, had not been decided by the Supreme Court. After that decision plaintiff filed the additional count, which charges, *inter alia,* that on or about January 9, 1930, defendant issued its bonds in the amount of $8,125,000; that the issuance of the bonds was made under an act of the legislature permitting

the issuance of bonds by defendant without submission to the people only where the funds realized therefrom were to be used exclusively in the construction of certain sewers, including the West Side Intercepting Sewer, a part of which was being constructed by plaintiff; that defendant, on January 16, 1931, duly appropriated from the proceeds of the said bond issue of 1931 the sum of $4,907,652.25 for the said Intercepting Sewer; that thereafter the defendant illegally used part of the said sum for other purposes and by reason thereof had not the money to pay the plaintiff. It was stipulated that defendant, on November 1, 1931, had on hand $1,080,000 of the said funds so appropriated and that on that date it used $800,000 of the said amount to purchase its own tax warrants and that on December 1, 1931, it used $275,000 of the then amount on hand to purchase more of said warrants, and that the proceeds received from the said warrants were used for purposes other than sewer construction work. During the trial, before proofs were offered in connection with plaintiff's claims under count II and additional count, the court, after a discussion of the *Underground* case, sustained objections interposed by defendant to all proof offered by plaintiff upon the instant branch of the case, and thereafter, in the judgment order of June 28, 1940, dismissed count II and additional count.

Article 30 of the contract in the instant proceeding is the same as article 32 in the *Underground Construction Co.* case. Article 30 reads as follows:

"Art. 30. Should the Contractor be obstructed or delayed in the commencement, prosecution or completion of any part of said work by any act or delay of the Sanitary District, or by inability with the exercise of due diligence to obtain sites for necessary shafts, or by any act or delay on the part of railroads in furnishing cars or transporting any equipment, material or appurtenances for said work, or by riot, in-

surrection, war, pestilence, acts of public authorities, fire, lightning, earthquake, cyclone, floods, or through any default or delay of other parties under contract with the Sanitary District, or due to strikes, or to other causes, which causes of delay mentioned in this Article (Art. 30), in the opinion of the Chief Engineer are entirely beyond the control of the Contractor, then the time herein fixed for the completion of the work so delayed shall be extended for a period equivalent to the time lost by reason of any cause aforesaid, (provided that such extension of time shall in no case exceed one hundred twenty (120) days in the event the Contractor is unable, with the exercise of due diligence to obtain sites for the necessary shafts within said time) but no such allowance shall be made unless the Contractor notifies the Engineer before the fifth day of each succeeding month of all delays occurring in the preceding month.

"It is further expressly agreed that the Contractor shall not be entitled to any damages or compensation from the Sanitary District on account of any delays resulting from any of the causes above specified in this article (Art. 30), except compensation for wages for extra time for any necessary watchmen and for extra premiums of its bond, actually paid by the Contractor, on account of the additional time so required to complete all work hereunder, due only to delays caused by the Sanitary District or by other parties under contract with the Sanitary District. The Engineer shall decide the number of days that the Contractor has been so delayed and his decision shall be final and binding upon both parties hereto."

It is conceded that the trial court, in ruling that plaintiff could not sustain its claim for damages caused by the delay, was governed by the *Underground* case. After the decision in that case defendant paid plaintiff the cost of necessary watchmen and the additional premiums on the bond, caused by the delay, and plain-

tiff received the same "without prejudice for damages suffered by reason of the suspension."

The issue presented is, whether the additional count, with the proof offered in support of it, requires the application of a rule different from that laid down in the *Underground* case. Plaintiff contends that because of the special facts alleged in the additional count the ruling in the *Underground* case as to the effect of the Article in question does not apply. Defendant contends that the said special facts do not distinguish the instant case from the *Underground* case. The latter case was tried in the *nisi prius* court three times and was twice before the Appellate Court (277 Ill. App. 618 and 289 Ill. App. 609). The opinion filed upon the first appeal states that the Underground Construction Company had a contract with the instant defendant for certain construction work and that after approximately seventy per cent of the work was completed the defendant defaulted in the payment of one monthly progress installment and a part of another monthly installment that were due the contractor under the terms of the contract and that because of the default the contractor suspended work, which was not resumed for about ten months; that in November, 1928, the District had made provision for the issuance and sale of $27,000,000 of its bonds, and on January 15, 1929, a taxpayer procured an injunction restraining the sale and delivery of the bonds on the ground that the District had no right to issue and sell the bonds without first submitting the matter to a vote of the people; that during the suspension of the work the District obtained legislative authority to issue the bonds without a referendum and work was resumed under a supplemental agreement that protected the right of the contractor to sue for damages alleged to have been suffered by reason of the suspension. Plaintiff insists that there were two features in the *Underground* case that were responsible for the Supreme Court's de-

cision, one of which was that ". . . the 'act or delay' of the Sanitary District (the default in payment of installments) was not the result of any fault or affirmative act on the part of the District." Defendant contends that the Supreme Court held that "the language of the agreement [Art. 32 of the contract] was sufficiently broad to cover a breach resulting from *any act or any delay* on the part of the Sanitary District. The court does not consider the reason or underlying cause of the failure to pay. At no place does it discuss or even mention the fact that the failure to pay was caused by a taxpayer's suit, which, in turn, was caused by an attempt to sell bonds contrary to statutory provisions. From which we logically conclude that it was the breach—the failure to pay—that was within the contemplation of the parties, and that the underlying cause of the breach was wholly immaterial," and defendant argues that the opinion in the *Underground* case precludes plaintiff from succeeding upon its claims under count II and additional count. The Supreme Court, in the *Underground* case, reviewed the material facts and after holding that the plaintiff in that case might sue for damages for delay caused by failure to pay installments of the contract price when due, proceeds as follows (pp. 370, 371, 372):

"Was the failure to pay the past due installments an 'act or delay' which may be said to have obstructed or delayed the contractor in the completion of the work? Counsel say that such a construction was not within the contemplation of the parties and the Appellate Court so held. The argument is, that the parties could not have contemplated that the defendant would not have the money to pay installments promptly. In that view, few elements of damage could be said to come within the contemplation of the parties. Provisions of this character are usually inserted, not for the purpose of providing for that which the parties expect will happen, but to provide for situations that

may arise. Here they have provided that any 'act or delay' of the district by which the contractor might be 'obstructed or delayed' shall afford ground for relief to the contractor as therein provided. That failure to pay, or delay in paying, may well obstruct or delay the prosecution of the work by the contractor seems clear.

"  .   .   .

".   .   . We are of the opinion that damages for obstructing or delaying the work, caused by failure to pay installments, are within the contemplation of the parties as expressed in the contract, and that such delay in payment constituted ground for special damages.

"What, then, is the measure of such damages? This is also provided for and limited by article 32 of the contract. The language is 'said contractor shall not be entitled to any damages or compensation  .   .   . except compensation for wages for extra time for any necessary watchmen and for extra premiums of his bond, actually paid by said contractor on account of said additional time so required to complete all work hereunder.' This language exactly describes the situation before us and plaintiff, by it, agreed to such limitation.

"Plaintiff argues that the record shows large costs involved in rehabilitating and cleaning equipment and large rental values, all of which were lost. The only answer that can be made to such claim is the one the parties themselves have provided. Such items of cost might, by general or specific terms, have been included in the contract, but, not only were they not included, but the contract specifically declares that the plaintiff shall not be entitled to any damages or compensation for delay except those there enumerated. This is the contract of the parties, and, however strongly we might feel that plaintiff has been more severely damaged, this court can declare the rights of the parties

only by the contract, as the language of that instrument dictates.

"Other questions raised in the briefs do not require discussion."

The argument of plaintiff, that the ruling of the Supreme Court was controlled or influenced by the point made by defendant that the "act or delay" was not the result of any fault or affirmative act on its part, is not supported by the language of the opinion. If the Supreme Court considered that the nature of the cause of the delay was material in the decision of the point involved, the opinion would have so indicated. It seems plain to us that the ruling is based upon the language of Article 32 of the contract and that the said ruling is adverse to the claims of plaintiff under count II and additional count. We conclude, therefore, that the trial court did not err in sustaining the objections of defendant to plaintiff's offer of proof in support of count II and additional count and in dismissing the said counts.

*As to count III:*

As heretofore stated, the claims involved in the third count were settled before the trial and no complaint is made as to the action of the trial court in dismissing that count.

*As to the first claim of plaintiff under count IV— Invert:*

Plaintiff contends that it is entitled to recover the additional cost it sustained because of the change in plans in the construction of the invert, that the work involved in the change was not within the scope of the original plan and was caused by a deviation from it, and that the court erred in dismissing plaintiff's count IV, so far as said count involves this claim. In reference to the invert the contract provides:

"The inverts of all sewers shall be finished with mortar, placed with the concrete and screeded, floated and troweled to a smooth, true and uniform surface

and in addition, after the concrete has set, shall be given a thin coat of neat Portland cement, applied with a whitewash brush.

"The inverts of all sewers shall be protected during the entire progress of the work and thoroughly cleaned before final acceptance.

"The cost of performing all work necessary to obtain satisfactory surfaces for the interior of the sewer and appurtenances shall be included in the unit or lump sum prices hereinafter specified and no additional payment will be made by the Sanitary District to the Contractor for performing said work."

Plaintiff constructed 2,295 feet in the west heading and 2,560 feet in the east heading and completed the invert work required, with the exception of the application of "a thin coat of neat Portland cement, applied with a whitewash brush." The grade of the invert was established by defendant's Engineers and the work was constantly under the inspection and supervision of defendant's Engineers and inspectors. Defendant does not contend that it made any complaint as to the character of the work during its progress. After plaintiff had constructed 2,295 feet in the west heading and 2,560 feet in the east heading an Assistant Engineer of defendant ordered the grade of the invert to be lowered one and one-half inches and also ordered plaintiff to chip one and one-half inches from the top of the 4,855 feet that had been completed. Plaintiff carried out the order. Plaintiff contends that the work done in pursuance of defendant's orders was not "extra work" nor "additional work," that it was done in pursuance of an "alteration" in the plans and specifications. Defendant contends that the order of the Engineer in directing the lowering of the grade of the invert was not a change in plans; that the invert was not being constructed in accordance with the specifications and that its Engineer was authorized under the terms of the contract to cause the defective work to

be corrected and plaintiff was required to correct it without additional compensation. This position of defendant is plainly an afterthought as the evidence shows that the work done before the order was under the inspection and supervision of defendant's Engineers and inspectors. The chipping work was occasioned by defendant's order to lower the grade of the invert. The contention of defendant that all that it did was to cause plaintiff to correct defective work is without merit. We conclude that plaintiff was entitled to recover the additional costs arising from the change in the grade of the invert. Its damages should be limited to the additional costs sustained by plaintiff by reason of the chipping and reconstruction of the part of the invert that was ordered chipped. Plaintiff states, very briefly, that the change in the grade also increased the cost on the balance of the invert constructed after the change in the grade and that it should be allowed damages for the increased costs. We find no merit in this contention. Indeed, plaintiff, in its reply brief, practically concedes that there might be a reasonable question as to this latter claim. We conclude that the court erred in finding that the evidence offered by plaintiff was insufficient to sustain any of the claims under count IV and in dismissing count IV.

*As to the second claim of plaintiff under count IV— Use of compressed air:*

Plaintiff contends that defendant's Engineer forced it to use compressed air when it was not necessary, thereby entailing an additional cost to plaintiff of over $13,000, and that therefore defendant must respond in damages to plaintiff, and that the court erred in dismissing plaintiff's complaint as to this claim. Plaintiff was required by the contract to so conduct the work that no movement of the soil over or adjacent to the sewer should occur at any time, to protect all existing structures along the line of the sewer, and to take

such precautions as were necessary to render all portions of the work secure in order to decrease the liability from accidents and avoid contingencies which might delay the work. The contract required plaintiff to "use compressed air if necessary." The evidence shows that plaintiff started work in the main tunnel in the latter part of February, 1931, and at first made very slow progress in the work because of poor ground conditions. Plaintiff was not using compressed air at the time, and it was this fact that caused the slow progress. Shortly after the work was commenced there was a settlement in the street and the car tracks on 22d street also settled. Then plaintiff, of its own volition, "purchased and installed air locks in both the east and west headings," and the use of compressed air was continued until November 24, 1934, when plaintiff, without obtaining the consent of defendant, discontinued its use. On November 26, 1934, defendant's Engineer, in a letter to plaintiff, stated: ". . . you are hereby ordered to replace the air in the west heading from Shaft # 1 until such time as the rock is an adequate distance above the top of the concrete *or to use some other method which will insure proper support of the material in and above the arch of the sewer and prevent movement of any material in the heading or adjacent thereto.*" (Italics ours.) After plaintiff received this letter it continued the use of compressed air. In March, 1935, plaintiff requested that it be allowed to discontinue the use of compressed air and on March 19, 1935, the request was granted. The claim of plaintiff covers the cost of using compressed air between November 26, 1934, and March 19, 1935. Plaintiff concedes that it was necessary *to* use compressed air where sandy soil, soft loam and soft swelling clay were found but contends that between November 26, 1934, and March 19, 1935, "it was rock, where use of air pressure was entirely useless." Defendant contends that the evidence shows that the elevation

of the top of rock had varied from three feet above the top of concrete to six feet below it, that another dip below the top of the concrete was probable, and that under such conditions it was necessary to use compressed air to prevent movement of soil over or adjacent to the sewer and to protect the lives of men engaged in building the tunnel. Having in mind the awful consequences of the fire and the fact that settlements had occurred at a time when compressed air was not used, it was the plain duty of the Engineer to exercise his right, under the contract, to insist that compressed air be used when it was necessary. Whether the Engineer's order was an arbitrary act was a question of fact, and after reading the relevant evidence we are satisfied that plaintiff has not shown that the order to use compressed air at the time in question was not warranted under the facts and was an arbitrary act of the Engineer. We approve, therefore, the finding of the trial court in denying plaintiff's instant claim under count IV.

*As to the claim of plaintiff under count V—Elimination of 8'6" sewer:*

The trial court heard evidence bearing upon this claim. Plaintiff contends that defendant, "by eliminating the 8'6" sewer, committed a breach of its contract . . . and is liable for damages," and that the trial court erred in entering the following judgment, on December 10, 1940:

"That the defendant did dispense with the construction of the branch eight foot six inch sewer constituting item 3 of the contract between the plaintiff and the defendant and involved herein; AND DOTH FURTHER FIND: that the plaintiff suffered a loss of profit as a result of omitting such construction; but the Court FURTHER FINDS: that under the provisions of Article 6 the right is reserved to the defendant to omit the construction of the said eight foot six inch branch sewer so described in item 3 of said contract without such

omission constituting a claim for damages or for loss of profits on the part of the plaintiff.

"Wherefore, and solely because of the provisions so contained in said Article 6 of said contract, it is considered by the Court that the plaintiff take nothing by that part of its suit covered by Count V of its complaint, and that the defendant go hence without day, and that defendant do have and recover of and from the plaintiff its costs and charges in this behalf expended, and have execution therefor."

Defendant contends that the determination of the question as to whether defendant breached the contract by the elimination of the said sewer "rests upon the interpretation of Article 6 of the contract," and that the trial court correctly interpreted that Article. The material parts of Article 6 of the contract are as follows:

"Changes in Plans.

"Art. 6. The Sanitary District reserves the right to make any changes in the specifications and plans which may be deemed necessary either before or after beginning any work under this contract, without invalidating this contract; provided that if alterations are made, *the general character of the work as a whole is not changed thereby.*

"If such alterations increase the quantity of work to be done, where unit prices are specified, such increase shall be paid for according to the quantity of work actually done at the unit price specified under this contract for each class of work performed. If such alterations diminish the quantity of work to be done, where unit prices are specified, they shall not constitute a claim for damages or for loss of profit on the work that may be dispensed with, and the Sanitary District shall not be required to pay for work or material omitted." (Italics ours.)

Plaintiff contends that item (3) of the contract also throws light upon the question. Item (3) reads as follows:

"(3) . . . In the event that the Contractor is ordered by the Engineer, in writing, he shall *omit* doing of any work designated by the Engineer *which is included within a distance of fifty (50) feet from either of the end limits of this contract,* and the Contractor shall not be paid for any work omitted and not performed by him, or for any anticipated profits on work omitted, and the work omitted may be performed by the Sanitary District or by any other of its contractors. In any event, the Sanitary District shall not be liable to the Contractor for any damages or extra expense for any decrease in the work to be performed hereunder, or for any expense that may result from any increase of the quantities of work, or from the performance of any work by the Contractor *within a distance of fifty (50) feet beyond either end limit of this contract,* in excess of the unit prices herein specified for work actually performed, nor shall the Sanitary District be liable for damages on account of the occupation by another contractor of the space *within a distance of fifty (50) feet inside of either of the end limits of this contract.*" (Italics ours.)

The 8'6" tunnel or sewer constituted Item No. 3 in the contract. The contract provided for a main line and a branch line (the 8'6" sewer) which was to be built on 22d street and which was to be 1,180 feet in length by 8 feet 6 inches internal height by 8 feet 6 inches internal width, the cost to be $55 per lineal foot. The so-called elimination of the branch line was accomplished by a resolution adopted by the Board of Trustees of the Sanitary District on or about May 3, 1934. On that date defendant's Committee on Engineering sent the following letter to the President and Members of the said Board of Trustees:

"Gentlemen:

"Your Committee on Engineering reports that on November 26, 1930 (Page 1525 of the Proceedings) the Ryan Company entered into a contract with the Sanitary District for the construction of the West Side

Intercepting Sewer, Contract No. 3, which contract was in some respects changed by two supplementary agreements between said parties.

"Your Committee further reports that it has received a communication from the Chief Engineer in which he states that due to changes in flow conditions an increase in the quantity of sewage and water to be discharged into said sewer, it is advisable to transfer that part of the West Side Intercepting Sewer area lying east of the Chicago River between Roosevelt Road and 31st Street to the Southwest Side Sewer area which will eliminate from said contract Items 3, 4 and 10, and result in reductions in Items 12, 13 and 14, as follows to-wit:

"Eliminate—Item 3, 1180 feet of 8'-6" sewer @ $55.00 .... $64,900.00
"Eliminate—Item 4, Junction at Canalport Ave........... 500.00
"Eliminate—Item 10, Connection at Halsted St............ 13,000.00
"Reduction in Item 12, Standard Manholes 50 lin. ft. at
  $16.00 ........................................... 800.00
"Reduction in Item 13, Reinforcement Steel, 58,000# at 4¢.. 2,352.00
"Reduction in Item 14, Iron Castings and misc. metals, 1600#
  @ 8¢............................................. 128.00
      "Reduction of Contract............................ $81,680.00

"He further states that it is necessary to order said company to eliminate from said contract and to make the reductions therefrom as above outlined, and the State Engineer of the Public Works Administration has approved the same.

"Your Committee having considered the matter recommends the passage of the following order:

"ORDERED: That the Chief Engineer be, and he is hereby, authorized to order the Ryan Company to make the elimination and deductions as above set forth provided that the surety on its bond consents thereto, and provided further that said order and consent shall be on condition that said company reserves its right to claim that it is entitled to damages by reason of said eliminations and deductions and that the Public Works

Administration shall be under no obligation, legal or moral, to finance any unreduced costs, increased overhead or other charges which may accrue by reason of said eliminations.''

The Sanitary Board passed a resolution in accordance with the recommendations of the Committee. Count V of plaintiff's complaint alleges, *inter alia,* that the construction of the 1,180 feet of 8 foot 6 inch sewer was included in the contract at a price of $55 per foot and that defendant ordered plaintiff not to do the work, and then let the work to others. Defendant's answer admits that the branch sewer was included in the contract as alleged in plaintiff's complaint, and admits that it ''ordered plaintiff not to do said work and let said work to others than the plaintiff,'' and avers that defendant reserved in its contract the right to so order and so let and that no damage thereby resulted to plaintiff. Plaintiff contends ''(1) The 8'6'' sewer constituted an integral part of the contract and its elimination changed the general character of the work as a whole. (2) Article 6 of the contract did not authorize the omission of the branch sewer by the defendant. This could only be accomplished by an 'omission clause.' (3) The right of the defendant to eliminate a portion of the work did not depend upon the percentage eliminated but upon the character of the portion eliminated.'' Defendant argues: ''Article 6 permits defendant to make changes *in the plans and specifications.* The plans are specifically made a part of the contract itself. The specifications for the work are *incorporated within the body of the contract.* They are, in fact, the contract. Under such circumstances, to argue that a right reserved to change the specifications did not include a right to change the items of the contract, is sheer nonsense.'' It further argues that in the interpretation of the phrase ''general character of the work as a whole,'' the words ''as a whole'' should be treated as superfluous.

The letter of the Engineering Committee and the resolution passed by the Board show that the 8′6″ sewer was not eliminated. Its construction was transferred to the Southwest Side Sewer area and some party other than plaintiff built it. Defendant, by its act, sought to take away from plaintiff the right it had, under the contract, to build the said sewer.

If Article 6 gives defendant the right to eliminate from the contract the building of the sewer in question without compensation to plaintiff, why was it necessary to include Item (3) in the contract? When Article 6 is interpreted in the light of Item (3) it seems plain that defendant's instant contention cannot be sustained. But in our judgment Article 6 of the contract did not authorize defendant to take away from plaintiff the right to build the branch sewer. It did confer upon defendant the right to change or modify the plans of the work and the materials and quantities that might be used in its construction "provided that if alterations are made, the general character of the work as a whole is not changed thereby." The courts recognize and enforce the distinction between the right to change plans and the right to omit integral parts of the work. That the building of the sewer in question was an integral part of the work to be performed by plaintiff cannot be reasonably disputed. *Litchfield Construction Co. v. City of New York,* 244 N. Y. 251, involved a contract for the construction of certain sections of the New York subway, where the contractor was suing, *inter alia,* for the breach of its contract by the elimination of a spur of track 187 feet long, and the court said (pp. 272, 273):

"The section of the railroad which the contractor agreed to construct is of course described in the contract. That description includes the words 'including a spur curving northwesterly under Seventh Avenue, West Fifty-ninth Street, and Central Park, to a point about twenty-two feet west of the westerly building

line of Seventh Avenue.' Subsequently the contractor received a notice that 'The Commission on June 1st, 1916, took action eliminating from the contract this stub track construction.' By the elimination from the contract of this part of the work the contractor suffered damages in the sum of $16,813.65. The trial judge directed a verdict in their favor for this amount. The Appellate Division has held that the contractor is not entitled to these undisputed damages because the contract provided that the Commission reserved the right 'to alter, in any way it may deem necessary for the public interest, the drawings aforesaid, in part or together, . . . without constituting grounds for any claim by the contractor.' (216 App. Div. 517.) Although the spur which the contractor agreed to construct was only 187 feet long, it is part of the work as described in the contract which the contractor was bound to do and which the city was bound to pay for. Changes in the drawings might alter the manner in which such work was to be performed but changes in the drawings could not change the description of the work itself as contained in the contract. (See *McMaster v. State of New York,* 108 N. Y. 542; *Petersen v. City of New York,* 205 N. Y. 323.)''

The court overruled the Appellate Division and affirmed the action of the trial court in directing a verdict for the plaintiff as to this branch of the case. Where a party to a contract desires to have the right to eliminate or abandon an integral part of the work specified in the contract it should include in the contract what is known as ''an omission clause.'' Such a clause was considered by the court in *Del Balso Construction Corp. v. City of New York,* 278 N. Y. 154. There the contract, after reserving to the Board the right to alter the drawings, etc., provided (p. 159): '' '. . . or *to omit any portion of the work without constituting grounds for any claim by the contractor for payment or allowance for damages or extra service*

other than is provided for under the classified Items of the Schedule of Unit Prices.' (Italics interpolated.)'' The court in commenting on this omission clause said (p. 159):

''Thus in the clearest of language the city reserves to itself this power to omit work without incurring liability.

''   . . .

''In none of the cases relied on by plaintiff was there involved a contract containing the omission clause quoted above. As a matter of fact, it was only after it had been held that the city could not with impunity omit certain work under the old form of contract which merely gave the city the power 'to alter, in any way it may deem necessary for the public interest, the drawings,' and contained the usual right to change work quantities, that, to remedy the situation, the omission clause involved herein was made a part of the standard form city contract. (See *Litchfield Construction Co. v. City of New York,* 244 N. Y. 251.)''

The court further stated (pp. 161, 162): ''Where an omission clause is contained in a contract the contractor must have this in mind in calculating his overhead when preparing his bid.'' In the instant contract there is no omission clause save such as is provided in Item (3). Article 6, as we have heretofore stated, specifically provides that if alterations are made, the general character of the work *as a whole* shall not be changed thereby. The percentage of the work eliminated does not determine the right of defendant to eliminate the sewer in question. The determining factor is the character of the portion eliminated. In *Del Balso Construction Corp. v. City of New York, supra,* the court said (pp. 160, 161): ''The omission, in fact, constituted only ten per cent, but whether an omission is incidental does not depend on the percentage of the work or the cost involved, but on the character of the work omitted. For example,

compare *Kinser Construction Co. v. State* (204 N. Y. 381), where it was held admissible to eliminate forty-one per cent of the work, with *Litchfield Construction Co. v. City of New York* (244 N. Y. 251), where it was held that the city lacked the power to omit two and one-half per cent of the work.'' The instant contract provides that it includes, first, a main line, and, second, a branch line, and it further provides that ''for well and faithfully completing said work, in full compliance with the plans and specifications, and the requirements of the Engineer under them, to-wit: . . . (3) For the sewer, 8 feet 6 inches internal width, complete, in place, as specified, the sum of Fifty-five Dollars ($55) per lineal foot.'' It also provides, without any qualifications, that ''Under Item 3 the Contractor shall construct in tunnel a concrete sewer 8 feet 6 inches internal width and 8 feet 6 inches internal height, as shown on the contract plans.'' The right ''to make any changes in the specifications and plans'' in the performance of the work did not, in our judgment, authorize defendant to abandon the entire work or any integral part of it. If defendant's contention is sound it had the right to take away from plaintiff ninety per cent of the contract, or more, without compensating the latter in any way for the damages it might have sustained thereby.

Defendant called two witnesses, who were allowed, over the objections of plaintiff, to give their opinion as to whether or not the elimination of the branch sewer changed the general character of the work as a whole. We do not decide whether the testimony of these two witnesses was favorable or unfavorable to either of the parties, as we are of the opinion that such testimony should not be used in interpreting Article 6.

The contention of plaintiff that the Sanitary District of Chicago, by eliminating the 8' 6'' sewer, committed a breach of its contract with the Ryan Company and is liable for damages, and that the court

erred in entering the judgment order of December 10, 1940, is sustained.

*Conclusion:*

That part of the judgment order of the Superior court of Cook county of June 28, 1940, that dismisses count I is reversed and the cause is remanded as to said count with directions to the trial court to hear evidence and determine the amount of the damages sustained by plaintiff and remaining unpaid under the contract of April 30, 1931, otherwise known as the "fire contract," and to enter judgment therefor.

That part of the same judgment order that dismisses count II and additional count is affirmed.

That part of the same judgment order that dismisses count III (entered by agreement of the parties) is affirmed.

That part of the same judgment order wherein the trial court found that plaintiff's evidence was insufficient to sustain its claim, under count IV, for the "additional cost of invert due to change in plans of invert flooring" and dismissing plaintiff's count IV is reversed so far as the said claim is concerned, and the cause is remanded with directions to the trial court to hear evidence and determine the damages sustained by plaintiff as to said claim and enter judgment therefor; the damages to be limited to the additional cost sustained by plaintiff by reason of the chipping of the invert and the reconstruction of the part that was chipped, but no damages to be allowed for any increased cost on the balance of the invert constructed after the change in the grade.

That part of the same judgment order wherein the trial court found that plaintiff's evidence was insufficient to sustain its claim, under count IV, for the "cost of maintaining air pressure in tunnel" is affirmed.

The judgment order of the Superior court of Cook county of December 10, 1940, is reversed and the cause

is remanded with directions to the trial court to hear evidence and determine the damages sustained by plaintiff under count V, and enter judgment therefor.

*Judgment order of June 28, 1940, affirmed in part and reversed in part with directions. Judgment order of December 10, 1940, reversed and remanded with directions.*

SULLIVAN, P. J., and FRIEND, J., concur.