James A. JACKSON, trading as Jim Jackson, Appellant,

v.

SAM FINLEY, INC., Appellee.

No. 22105.

United States Court of Appeals Fifth Circuit.

Sept. 6, 1966.

John H. Haley, Little Rock, Ark., T. Y. Minniece, Meridian, Miss., for appellant.

J. A. Covington, Roger B. Shows, Snow, Covington, Shows & Watts, Meridian, Miss., for appellee.

Before RIVES and THORNBERRY, Circuit Judges, and GARZA, District Judge.

RIVES, Circuit Judge.

This case presents an attempt to recover the fair value of work performed on a street resurfacing project in Meridian, Mississippi, during 1961. The appeal is from a judgment dismissing the complaint on its merits and awarding costs to the appellee. We affirm.

In the fall of 1961, the City of Meridian commenced a major street resurfacing program. Part of the contemplated work was the hot planing of some (but not all) of the streets prior to re-paving them. Hot planing is a process for removing a portion of the existing street surface so that the resurfaced street will not be higher than the curb; the flow of water off the resurfaced street will therefore not be impeded. The machine used to perform this work has a heating device to soften the pavement followed by a cutting edge which shaves or scrapes the material from the street. A conveyor then picks up the removed material and places it in a dump truck which follows the machine. Normally the machine will cut one quarter of an inch on each pass over a street; a cut to a depth of one inch, therefore, will generally require from four to six passes, depending on the nature of the material being removed. Hot planing jobs are divided into "heavy cutting" and "light cutting," the former encompassing situations where from an inch and a half to three inches of material is to be removed, and the latter including cuts of less than one and one-half inches. On a light cut, then, only a few passes may be required, while a heavy cut may require eight or more passes. The cost of a hot planing operation depends almost entirely on the number of passes that must be made over the street; a job requiring two passes will cost approximately twice that of one requiring only a single pass.

In preparation for receiving bids on the project the City of Meridian prepared a Notice to Contractors (containing an estimate of the work on the project) and an Instructions to Bidders. The Notice to Contractors contained, as one item of "the engineer's estimate approximately of the work to be done," 160,000 sq. yards of hot planing. The Instructions to Bidders had affixed to it a list of streets titled, "Streets and Avenues to be Resurfaced in 1961 Resurfacing Program." The Instructions contained the cautionary note: "This list of streets is not firm and may be modified by the City Council * * * in that certain streets and/or avenues may be removed * * * and others may be added at their discretion."

Sam Finley, Inc., the appellee, was interested in obtaining the prime contract for the resurfacing project. James A. Jackson, the appellant, heard informally of the project and contacted Finley concerning the hot planing portion of the work. Finley suggested that Jackson arrange for an appointment to look over the job. On September 15, Jackson flew

to Meridian and was met by Art Gammon, Finley's superintendent of Meridian area operations, who took Jackson over a number of Meridian streets.

What occurred during this inspection trip is not clear. Jackson testified that when he was told that a unit price was desired, he told Gammon that it would be necessary to calculate an average depth of the cuts that would have to be made. Gammon then told him that the cuts would vary from zero to three inches, and that approximately twenty-five per cent would be heavy cuts and the remainder would be light. He drove Jackson over several streets, telling him that these were representative of the heavy cutting, and then drove him over several others, telling him that these were representative of the light cutting. Jackson testified that Gammon had with him a printed list (apparently a copy of the list of streets to be resurfaced provided by the City), and that on this list were notations indicating what streets were to be hot planed. Gammon assertedly told Jackson that he had obtained this information informally from an employee in the City Engineer's Office.

Gammon, on the other hand, testified that he did have a separate list of streets he thought would be hot planed and that Jackson may have seen this. (He denied that he had, at the time of Jackson's visit, marked a copy of the City list.) Gammon maintained, however, that he had told Jackson that the separate list had been compiled by Gammon himself and represented only his opinion, based on inspections by himself and his men, as to which streets would be planed. He denied representing that he had obtained the information from the City Engineer's Office; in fact, he testified that he explicitly told Jackson that he had no information from the City Engineer's Office as to what streets would be hot planed.

After the inspection tour, Jackson estimated that an average cut of approximately one inch would be required for the project and submitted a bid of $.24 per square yard. Finley's subsequent proposal to the City listed the hot planing at $.26 per square yard; the Proposal to Contract form contained the following provision: "I/We understand that the quantities mentioned below are approximate only, and are subject to increase or decrease; and hereby propose to perform any increased or decreased quantities of work at the unit prices bid."

On October 6, Finley and the City executed a general contract for the resurfacing work. The Notice to Contractors, the Specifications, the Special Provisions, the bond, and the Proposal to Contract were incorporated into the contract. The hot planing work was listed at a unit price of $.28 per square yard, "if performed on all streets herein mentioned, or any part thereof."

On October 7, Finley and Jackson executed a subcontract for the hot planing work at the $.24 per square yard price. The principal contract and all items incorporated in it were made a part of the subcontract, which also contained the following provisions:

"It is understood and agreed between the parties hereto that Contractor makes no representation or warranty as to the amount of the work specified in the aforesaid Principal Contract and herein contracted to be done and performed by Subcontractor, but payments by Contractor to Subcontractor will be made only for the actual quantities of work performed to the satisfaction of the Contractor, in accordance with said Principal Contract, and this subcontract, and as allowed and approved by Owner or its representative.

"It is further understood and agreed that the quantity of the work herein contracted to be done by Subcontractor may be increased or decreased as provided in said Principal Contract without in any way invalidating this subcontract or the unit price or prices hereinabove provided for.

"Contractor reserves the right, at any time and from time to time, to change or alter the scope of the work herein undertaken by Subcontractor,

by making additions to and/or deletions from said work. Any such change shall be directed by written change order; and in such case, Subcontractor's compensation shall be proportionately adjusted, on the basis of original unit prices where applicable. * * * "

Work under the subcontract was begun in early October. The downtown area, which required heavy planing, was started first because the local businessmen wanted this portion completed before the Thanksgiving period. No overall plan of the project was provided Jackson's local supervisor; the work progressed on a day-to-day basis, pursuant to an agreement among Finley's representative, Jackson's supervisor, a representative of the City Engineer's Office and the City Inspector, under which, to minimize disruption of City activities, the City Inspector was authorized to direct, after a street was finished, on which streets work was to be begun next.

About two weeks after work had started, Jackson became alarmed at the slow progress of the hot planing, and came to Meridian to meet with the City Inspector, Finley's supervisor and a representative of the City Engineer. Jackson testified concerning this meeting:

"I said we have been down here in the downtown area in this heavy cutting and we are losing our shirts * * * but I just want to be sure that we get it scheduled out so that we can be assured of the entire job * * *. [T]hey assured me that * * * they would get a work schedule and I felt at that time that I would be certain of my light and heavy cuts * * *. In fact I made a joke about it at the time I said we don't want to be left holding the bag doing all of the heavy work where we are losing our shirt and they assured me that [the scheduling of the entire job] * * * would take place."

Jackson reported, however, that his supervisor could never get the City Inspector and the representative of the City Engineer's Office together to work out a schedule for the entire job.

Several streets not on the original list were added to the hot planing about this time. The testimony is not clear as to whether this was before or after the meeting, although Jackson testified that at the time he went to Meridian he was aware that some "extra" planing was being done but that he was unaware of the extent of this work.

On December 2, after 112,502 square yards had been hot planed, the City announced that the planing was to be stopped. Jackson, upon hearing of the stop order, came immediately to Meridian and a meeting was held in the City Manager's Office. Jackson testified that at this meeting he was told that the City had decided that hot planing was not desired for the lighter streets and that the planing was being cancelled rather than postponed until spring. The Assistant City Engineer, on the other hand, testified that the hot planing was stopped because of the cold weather (all planed streets had to be resurfaced within 72 hours of the planing, and enough streets had already been planed to keep the asphalt plant busy until it had to be shut down because of the cold weather), but that Jackson was given an opportunity to resume work in the spring to do enough additional hot planing on the borderline streets to bring himself within 25 per cent of the original amount, or up to 135,000 square yards. Jackson was told, the Engineer testified, to contact the City if he wanted to do this additional work, but he never responded.

Jackson withdrew two of his three machines immediately, but left the other in Meridian. No more hot planing was done on the resurfacing project and Jackson was paid for the 112,502 square yards at the contract unit price of $.24 per square yard.

The 112,502 square yards of hot planing which Jackson completed included about 88,000 square yards of heavy cutting and about 24,500 square yards of light cutting. Approximately 38,000 square yards of this planing consisted

of work on streets other than those originally contemplated; ten of the streets had not been designated for resurfacing and five had been "marked" for paving but not for planing on the list Jackson claims to have seen and relied upon. 26,460 square yards of this additional 38,000 square yards was heavy cutting.

Jackson was paid $27,000.48 under the contract. He estimated that his costs on the project were $37,460.76, leaving him with a loss of about $10,000.

The appellant's basic contention is that the compensation to which he is entitled for his work is not the contract unit price but rather is the fair value of the work. Thus he seeks to recover the difference between the amount paid and the fair value. This is essentially a *quantum meruit* approach. See 58 Am.Jur. Work and Labor, § 35. Although the appellant's theories are not entirely clear, he apparently asserts that he is entitled to the fair value for his services because the original contract under which he performed is invalid, or, in the alternative, because the contract, if properly interpreted, was breached by the appellee.

The district court, in dismissing on the merits, found that the contract was valid and excluded evidence of pre-contract negotiations.

■ Since jurisdiction in this case rests on diversity of citizenship, state substantive law must control. 28 U.S.C. § 1652; Guaranty Trust Co. of N. Y. v. York, 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079. Where the highest court of the state has not authoritatively spoken, the federal court may assume that state law will accord with generally accepted principles of substantive law. Marchessault v. National Grange Mutual Liability Co., 2 Cir. 1956, 229 F.2d 698, 701–702. But in such a situation, a federal diversity court nevertheless has an obligation to carefully examine the rules of construction and the substantive approach of the state court in analogous areas in an attempt to derive "instructive guidance" from the state tribunal. Firemen's Insurance Co. of Newark, N. J. v. Chicago, St. P., M. & O. Ry. Co., D.Neb. 1953, 116 F.Supp. 289, 291.

With these principles in mind, we turn to the appellant's contention that the subcontract was unenforceable.

■ If the contract under which the work was performed was invalid, the appellant is entitled under Mississippi law to recover the fair value of services and materials rendered under it. Carter v. Witherspoon, 1930, 156 Miss. 597, 126 So. 388.

All evidence of the pre-contract activities was received by the trial court under reservation and, at the conclusion of the trial, ruled inadmissible because the contract was not ambiguous. In view of the trial court's express finding that the contract was not invalid, we must assume that it did consider the parol evidence as it related to the validity of the contract as a whole.

The agreement here is arguably invalid for five reasons: fraud or misrepresentation, mistake, indefiniteness, lack of mutuality, and as contrary to public policy. The trial court held that the contract did not lack mutuality, was not indefinite nor contrary to public policy, and was not invalid for an absence of a "meeting of the minds." Moreover, it found that the agreement was made "by equally experienced and competent parties without any fraud or false representations." We agree that the appellant has failed to establish his position under any of these theories.

■ A contract will be held invalid for fraudulent representations only if the representations were made with knowledge of their falsity, without knowledge of their truth, or under such circumstances that the seller ought to have known of their falsity. Evans v. Malone, 1964, 250 Miss. 214, 164 So.2d 794. In view of the trial court's conclusion that there was no fraud, we must assume that it believed Gammon's testimony to the effect that he told Jackson only that, as the result of a personal survey, he had formed a conclusion or opinion as to what streets would be planed, and that

he had done no more than tell Jackson of this opinion. Moreover, in view of the express disclaimers in the contractual documents, the reliance assertedly placed on them by Jackson was unreasonable.

Much the same may be said of the mistake theory. Although Mississippi has recognized that a contract may be unenforceable for either mutual mistake[1] or unilateral mistake,[2] neither seems applicable here. In light of the express contractual provisions for changes inserted by the appellee, it is clear that any "mistake" was not mutual; the appellee specifically provided for changes and clearly anticipated them. Nor is this a proper case for equitable relief for unilateral mistake. Jackson's estimate was the result of a rapid examination. No firm commitment as to the streets to be planed was given by either the City or the appellee; a reasonable examination by Jackson would certainly have revealed to him (if he did not already know) that the designation of streets for planing was uncertain and subject to change by the City. To grant relief for mistake under such conditions would be clearly improper.

A contract may, under Mississippi law, be too indefinite in its terms to be enforced. Quick and Grice v. Ashley, 1956, 227 Miss. 273, 86 So.2d 40. But where the nature of the situation prevents precise advance designation of details, somewhat less preciseness is required of the parties in drafting a binding agreement. Vicksburg Waterworks Co. v. J. M. Guffy Petroleum Co., 1905, 86 Misc. 60, 38 So. 302. We are unable to say that the trial court's conclusion that the contract was definite enough to enforce was erroneous.

Nor does the contract appear to lack mutuality. Although the *appellee himself* did reserve the right to alter or change the "scope of the work" by making additions or subtractions, we are not convinced that this conferred on him the "absolute and unrestricted right to cancel or terminate at any time" essential to a finding of a lack of mutuality.[3] Moreover, it must be pointed out that the clause permitting the City to change the designated work cannot be held to confer a right of cancellation dependent on the will of the appellee, and thus is not material to the mutuality argument. A contract does not lack mutuality because one promise is conditioned on the activity of a third party. In re Sadler's Estate, 1957, 232 Miss. 349, 98 So.2d 863.

The appellant has also failed to establish that the subcontract is unenforceable as contrary to public policy. Mississippi has taken a restrictive view of the power to declare contracts unenforceable for this reason, and has required a showing that the contract be prohibited by "express terms or the fair implication" of a statute or judicial decision. State ex rel. Knox v. Edward Hines Lumber Co., 1928, 150 Miss. 1, 115 So. 598; Orrel v. Bay Manufacturing Co., 1904, 83 Miss. 800, 36 So. 561, 70 L.R.A. 881. We agree with the trial court that the provisions for supplementary agreements in the Standard Specifications of the Mississippi State Highway Department[4] and the danger of abuse of the authority to alter a project do not constitute sufficient showing of a public policy to meet the stringent Mississippi test.

We hold, then, that the appellee has failed to demonstrate that the contract

1. Wall v. Wall, 1937, 177 Miss. 743, 171 So. 675.

2. Terre Haute Cooperage v. Branscome, 1948, 203 Misc. 493, 35 So.2d 537.

3. 17 C.J.S. Contracts § 100(6), pp. 806–807.

4. The Standard Specifications provide that supplemental agreements are necessary when the Director decreases or increases quantities of pay items so as to vary the total sums in the contractor's Proposal by more than twenty-five per cent. Such agreements may also be made whenever any change, whatever its scope, affects a hardship on the contractor. These provisions are not directly applicable here. See note 5, infra.

was unenforceable, and now turn to the appellant's second theory.

The appellant argues that the omission clause must not be read literally but must be held to be circumscribed by the intentions of the parties at the time of contracting. Thus, it is asserted, the parties intended that the omission clause authorize only changes which would not completely alter the contemplated scope of the work. This argument was rejected by the trial court, which found the contractual language unambiguous and excluded all parol evidence offered to prove the "real" intentions of the parties.

 Mississippi case law makes clear that a "meeting of the minds" is not required for a valid contractual provision, and that if the contractual language unambiguously indicates an agreement, the fact that this may not correspond to the actual understanding of the parties will not justify the admission of parol evidence to modify the language. Landry v. Moody Grishman Agency, Inc., Miss. 1965, 181 So.2d 134.

The appellant cites a variety of textual and decisional authorities for his proposition that contractual provisions permitting a municipal corporation to alter work in a contract for public works are limited by the intention of the parties to such modifications as will not radically change the nature or cost of the performance. McQuillin, Municipal Corporations § 37.125, pp. 395–396 (3rd ed. 1950); Hensler v. City of Los Angeles, 124 Cal.App.2d 71, 268 P.2d 12 (1954);

Drainage District No. 1 of Lincoln County, Nebraska v. Rude, 8 Cir. 1927, 21 F.2d 257.

 We do not consider these authorities controlling here. Mississippi contract law requires that where contractual language is unambiguous, the contract read literally must be enforced. The contractual right of the city to make extensive changes in the hot planing project was in no way ambiguous. Many of the cases cited for the appellant's proposition have contained provisions which expressly limited or restricted the City's authority to make such changes. See, for example, Ryan Co. v. Sanitary District, 1943, 317 Ill.App. 549, 47 N.E. 2d 576. Where, on the other hand, the contractual right to make omissions is unambiguous and unrestricted, there is authority for reading the language literally, even from a court which had earlier given a restrictive reading to a less broadly worded provision. Compare Litchfield Construction Co. v. City of New York, 1926, 244 N.Y. 251, 155 N.E. 116, with Del Balso Construction Corp. v. City of New York, 1938, 278 N.Y. 154, 15 N.E.2d 559.

In light of the unambiguous language used in the contract, the use of a unit price (which emphasized that the City was not considering the hot planing as a single, indivisible project), and the objective emphasis of Mississippi contract law, we agree with the trial court's conclusion that the contractual language was unambiguous and contained a legally binding agreement between the parties.[5] The judgment is therefore affirmed.

5. The appellant also argues that the Standard Specifications (see note 4, supra) were incorporated into the contract and that the contract therefore requires that a change of the extent involved here be accompanied by a supplemental agreement. We believe, however, that these provisions are not controlling because the contract expressly provided for the incorporation of "Construction Specifications only, not pay items"; the sections relied upon by the appellant seem clearly to deal with pay items. Moreover, the Specifications were incorporated "except where superseded by the special provisions * * * contained herein"; the express provision in the subcontract for authority to omit portions of the work would seem to supersede these sections of the Specifications asserting to modify this right.