**AFFHOLDER, INC., a Missouri corporation, Plaintiff-Appellee,**

v.

**SOUTHERN ROCK, INC., a Mississippi corporation, Defendant-Appellant.**

No. 83–4420.

United States Court of Appeals,
Fifth Circuit.

July 2, 1984.

Opinion on Denial of Rehearing and Rehearing En Banc Aug. 17, 1984.

Butler, Snow, O'Mara, Stevens & Canna-da, Thomas W. Prewitt, Jackson, Miss., for defendant-appellant.

Campbell & De Long, Fred C. DeLong, Jr., Greenville, Miss., Alan E. Popkin, St. Louis, Mo., for plaintiff-appellee.

Before CLARK, Chief Judge, and RU-BIN and POLITZ, Circuit Judges.*

ALVIN B. RUBIN, Circuit Judge:

A subcontractor who installed a tunnel as part of a sewer system seeks to recover from the contractor a sum almost six times the contract price because the location of the tunnel was changed from the place shown in the bid documents and the different subsoil and water invasion problems there encountered occasioned a vast increase in cost. The contractor resists on the basis that the trial court's fact finding of a change in conditions between the two sites and other findings were clearly erroneous; notice of the change was not timely given, as required by the contract; and other defenses. The contractor also counterclaims for its increase in costs occasioned by the subcontractor's alleged delay in building another tunnel. We conclude that the trial court's findings were supported by substantial evidence and that it

* CLARK, Chief Judge, dissenting.

correctly applied Mississippi law in this diversity case. We, therefore, affirm its judgment in favor of the subcontractor on both projects.

## I.

The town of Richland, Mississippi, employed Lester Engineering Company to design and supervise the construction of a sewer system. Lester designed a system that would be operated solely by the force of gravity. This required pipelines to be laid to accurately measured depths so that sewage entering the lines would flow through the system without need for pumping and without backing up. The sewer lines would cross beneath roads, and it was necessary to tunnel under these roads to install the lines. The installation of the lines in these tunnels would require excavation of subsoil many feet beneath the surface. The subsoil in the area consists of earth, sand, and gravel, with considerable water intrusion. A clay bed, of the type known as Yazoo clay, lies at varying depths in the area. There is little water penetration into this type clay and tunnelling through it is more economical than tunneling through earth, sand, and gravel.

The project was first advertised for public bids in the spring of 1975. Affholder, Inc. desired to build the three tunnels that were specified by subcontract from the principal contractor awarded the bid for the entire system. Because subsoil conditions determine the difficulty and cost of tunneling, Bob Affholder, Affholder's President, desired to investigate these conditions.

One of the tunnels was to be built under "old" Highway 49. At this location, Bob Affholder witnessed an open pit test; this was performed on the east side of the highway, about 75 feet from the place where a boring was later made, by using mechanical equipment to cut a trench through the dirt and mud to the underlying Yazoo clay. The depth at which clay was encountered was not, however, measured. Affholder then consulted Vacuum Underdrain to estimate the kind of dewatering equipment that would be needed and its cost. Thereafter, Affholder submitted a bid on the subcontract to various contractors, but all of the contractors' bids to Richland exceeded available funds, so no contract was let.

The project was then somewhat altered. A year later Richland again advertised for bids. Bob Affholder and William Kuhlmann, Affholder's administrative vice president and area manager, who had not been involved in the 1975 bidding, visited the proposed location of the Highway 49 tunnel. No one representing Richland, Lester or Southern Rock was present, but Affholder and Kuhlmann located what they believed was the site by the presence of two engineering stakes, which they thought to be markers for the proposed center line of the pipeline, and by the fact that other contractors were also visiting the site. Bob Affholder and Kuhlmann, therefore, believed that they were at the proper location. The bid documents contained some information about subsoil conditions, but the soil boring closest to the Highway 49 tunnel was about 250 feet south of the tunnel location, on the west side of Highway 49. Knowing the importance of the subsoil conditions, particularly the depth at which clay lay, Affholder employed Engineers Laboratories, Inc. to take another soil boring. Engineers Laboratories took one boring on the east side of Highway 49. Kuhlmann attended the test, watched the technician who conducted the boring make entries on a log of the test, and discussed each entry with the technician.

The Highway 49 tunnel was to consist of a liner pipe or plate, forty-eight inches in outside diameter, inside which would be installed a carrier pipe, twenty-nine inches in outside diameter and twenty-four inches in inside diameter. The interior carrier pipe carries the sewage. It rests on rails installed inside the liner plate. These rails and the carrier pipe resting on them must be installed at exact depths in order that gravity will propel sewage through the system. The lowest point of the inside of the

carrier pipe, the invert, is specified on the engineer's drawings.

Based on the Engineers Laboratories soil boring, Kuhlmann believed that clay lay thirty-three feet below the surface and that the top of the carrier plate would be about a foot or a foot and a half beneath the clay. The engineering log indicates, however, that the clay lay thirty-four and a half feet beneath the surface, and this was supported by the testimony of a representative of Engineers Laboratories. Kuhlmann was convinced that the tunnel would be entirely within the clay formation. On behalf of Affholder he prepared a bid based on his expectations of soil and water table conditions and submitted this bid to other contractors who were expected to bid on the project, but not to Southern Rock.

When the 1976 bids were opened, Southern Rock was the lowest bidder and was awarded the contract. Affholder then persuaded Southern Rock to subcontract to it the tunneling for all three locations. The contract between Richland and Southern Rock was made a part of the subcontract between Southern Rock and Affholder. Affholder was required to do its work "in strict compliance with the terms of" the Richland contract with Southern Rock.

After the bid was accepted, on April 16, and at some time before August 2, Richland, through Lester, issued working drawings, as the basic contract required. On the plan for this work, the tunnel was located about 150 feet north of the location shown on the bid drawing, the location at which the soil boring was taken. Southern Rock was aware of the change in location but it did not give this information to Affholder. The change was apparent to Southern Rock's general superintendent because it involved not only a change in the tunnel but a change in the location of the entire sewer line. Moreover, there were now two cleared rights of way on the ground, one showing the path according to bid documents and the other showing what

Southern Rock's general superintendent called "the new location."

Both the bid drawing and the working drawing located the tunnel by station marks shown on the bottom of the drawings, which measure, in 100-foot increments, the distance between various locations on the project. The tunnel is located between stations six and seven on the bid drawing and between stations four and a half and five and a half on the working drawing. Other than these notations nothing on either set of drawings indicates the location of the tunnel. There is nothing on the working drawing to indicate that the tunnel is to be located in a place different from the one designated on the bid drawing, and this could be determined only by comparing the station marks on the two drawings.

Affholder's foreman had not been involved in the bidding. Kuhlmann gave him the working drawings and other working documents and he promptly proceeded to start the work in accordance with them. As required by the subcontract, Southern Rock marked the work site on the ground with line and grade stakes, but there were no landmarks in this rural location that made perceptible the fact that this was in a place different from the one where the test boring had been made.

Southern Rock began work on August 2. Affholder began work on its part of the project on September 22. By this time the area had apparently been cleared so there were no longer two visible paths on the ground.[1] Affholder began to work at the place marked by engineers' stakes, marking the centerline of the line. This was the place pointed out to Affholder by Southern Rock's representative as the site for the tunnel. Within a few days, Kuhlmann realized that conditions at the work site were not what he had expected. The volume of water was much greater and the clay lay deeper than he had anticipated. The tunnel could not be lowered to lie completely in

---

**1.** Southern Rock's general superintendent testified that both clearings and both sets of stakes were still visible when he delivered the plans to

Affholder's representative but this was some time before Affholder began work on the site.

clay because the carrier line had to be at a precise depth. Affholder realized then that construction would occasion greater difficulties than it had contemplated. Kuhlmann thought, however, that he had made a mistake in evaluating subsurface conditions and that the cost increase resulted from an error on his part. Affholder, therefore, made no demand on Southern Rock for extra compensation, but doggedly completed the project. The work that it had expected to complete in fifteen days took a year. When Affholder finally finished the project, it had spent $238,860, over six times the contract price of $37,219.50.

After the work was finished, Kuhlmann and Bob Affholder attempted to find out exactly why Affholder had suffered such a loss on the job. After two days of studying the documents, Kuhlmann realized that the location of the tunnel had been changed. Affholder then gave Southern Rock notice that it expected additional compensation. Southern Rock passed the notice on to Richland. On behalf of Richland, Lester rejected the claim because it was untimely filed and the conditions at the two locations were not substantially different. Lester and Richland concluded there was, therefore, no justification for additional compensation even assuming the demand was filed on a timely basis.

While still under the impression that it had simply misbid the work, Affholder secured permission to change the liner plate from forty-eight-inch diameter to sixty-inch diameter, at no cost to Southern Rock. Southern Rock's and Lester's representatives both testified that Affholder had managed the project inefficiently and that its costs were further increased by floods and equipment failures. Kuhlmann testified that the increase in costs was due entirely to the relocation of the tunnel.

Affholder sued for the total amount it had spent on the project. Southern Rock charged that Affholder had delayed in its work on another tunnel and counterclaimed for $85,000 in damages.

After a three-day bench trial, the district court ruled in Affholder's favor on both claims based on the fact findings that we have summarized. It also found that the conditions at the bid location were vastly different from those at the actual location, with the result that Affholder's work was rendered more expensive at the actual location; if the tunnel had been constructed at the bid location, the tunnel would have been constructed completely in clay and not in a mixed-face situation. It held that, because Affholder had given Southern Rock notice within thirty days after discovering that the location had been moved, the company had complied with the contractual requirement concerning notice. As a result, the court found in favor of Affholder and awarded it all costs it had incurred. Southern Rock appealed this decision as well as the court's failure to award it damages for Affholder's alleged delay in finishing another tunnel.

The parties agree that decision of this diversity-jurisdiction case is governed by Mississippi law, that the fact-findings largely control its resolution, and that we are required to accept these findings unless they are shown to be clearly erroneous. Fed.R.Civ.P. 52(a). Southern Rock faces this obstacle forthrightly: it contends that the district court was clearly erroneous in finding that: (1) if the tunnel had been built at the bid location, it would have been entirely within clay, and (2) there was substantially more water at the actual location than at the bid location.

## II.

Southern Rock's first thesis is that Affholder failed to prove that subsurface conditions in the two locations were different. No measurements of water level were taken at either place. Only one test boring was taken, on the east side of the highway. The depth of the clay on the west side, even at the bid location, was unknown. Its second predicate rests on the alleged impossibility of building the tunnel entirely within clay at the location tested, the bid location, at the required invert depth.

Therefore, Southern Rock argues, water intrusion and other problems would have occurred even if the location had not been changed, and the change did not harm Affholder.

Affholder now concedes that the Yazoo clay at the bid location lay thirty-four and a half feet deep. It argues that it might nonetheless have constructed the tunnel entirely within clay by laying the carrier pipe at the required invert depth, but not centering the carrier pipe in the tunnel pipe. Instead, it contends, it might have lowered the tunnel pipe so that the pipe lay entirely in clay. The inside top wall of the tunnel pipe would, after completion, lie very close to the top outside wall of the carrier pipe without a six-inch space between the two at the top side of the pipe. That this was physically possible can be mathematically demonstrated and is not disputed. Southern Rock contends, however, that such a placement would violate the contract specifications because they required that at least six inches of backfill surround the carrier pipe, that is, that the outside top of the carrier pipe was required to be at least six inches below the inside top of the tunnel pipe.[2] Nothing in the contract drawings exacts such a requirement and the

testimony does not support it. The record does not, therefore, support the physical impossibility argument. Indeed, Bob Affholder testified that while centering the carrier pipe in the tunnel pipe would have left six inches between the two for backfill, the contract did not require the carrier pipe to be thus centered. This testimony was not refuted.

 Affholder did not prove objectively or quantitatively the water levels at the two locations or the depth of the Yazoo clay formation at each side of the bid location. We cannot, however, disavow the trial court's findings simply because they are not supported by conclusive evidence. Bob Affholder testified that he observed water conditions at the test site and these were less severe than those encountered at the actual location. He had also observed the pump test conducted by Vacuum Underdrain at that time. Both he and Kuhlmann observed the test boring and had the opportunity to determine what it showed about underground water conditions.

The soil boring established the clay depth on the east side of the bid location. Bob Affholder testified about his predictions, based on his experience, concerning the likely depth on the west side of the high-

**2.** Southern Rock's brief contains a chart that explains its argument. The figures on the right represent the elevation at which the bid drawings required the tunnel to be built.

| | Elevation in feet on Side of Highway 49 | |
| | East | West |
| Actual invert or bottom of carrier pipe as shown on bid drawing | 235.69 | 235.90 |
| Add 2.00 feet inside diameter of carrier pipe | 2.00 | 2.00 |
| Add .21—(½ of 5-inch outside diameter of carrier pipe) | .21 | .21 |
| Thus, the top of the carrier pipe is at an elevation of | 237.90 | 238.11 |
| *Add .50—(6" between top of carrier pipe and tunnel pipe as Affholder testified)* | .50 | .50 |
| Add .13—(½ of 3" outside diameter of 48" tunnel liner) | .13 | .13 |
| Top of outside diameter of tunnel pipe | 238.53 | 238.74 |

Patently if the emphasized lines, which stipulate a difference of six inches between the top of the carrier pipe and the wall of the tunnel pipe are eliminated, the top of the outside diameter of the tunnel pipe becomes 238.03 feet on the east side and 238.24 feet on the west side. Southern Rock states that the elevation of the clay was 238.3 feet. Thus the top of the tunnel pipe would have been at least .06 feet (about half an inch) below the top of the clay if six inches of backfill had not been installed atop the carrier pipe.

These computations are on the basis of a "worst-case" scenario. The exact diameter of the wall of the tunnel pipe is not established in the record: the testimony states it is "two or three" inches. The computation assumes a three-inch diameter. The computation also places the depth of the clay deposit at thirty-four and a half feet. There is testimony that the deposit rose toward the west. Thus, the computation demonstrates only that it was not impossible, as Southern Rock contests, for the tunnel work to have been completed entirely within the clay deposit.

way at that place. He testified that the general trend of the clay in this area rose toward the west side of the highway. Bob Affholder had been in the tunneling and boring business more than twelve years and had previously done work in this area. While there was a basis on which the district court might have found the evidence insufficient to establish differences in conditions between the actual and the bid location, we are not left with a definite and firm conviction that its finding based on the testimony outlined was clearly erroneous. Fed.R.Civ.P. 52(a).

### III.

██ Affholder would be entitled to additional compensation only if conditions at the actual location were so different from those at the bid location that Affholder suffered an increase in cost as a result of the change and it either gave notice of its demand timely as required by the contract or was relieved from giving such notice.

The district court reasoned that Affholder's claim was not too late because its contract with Southern Rock was "premised on the condition that the tunnel … would be at the location specified in the bid documents." This, the trial court found, was an implied condition of the contract, and the change in location, without notice, was a breach of the contract by Southern Rock. We find it unnecessary to determine whether, under Mississippi law, such a condition was implied, for, even if the contract terms govern, Affholder's notice was timely.

The contract requires Affholder to give notice of its intent to seek additional compensation within thirty days "after the condition or conditions creating the alleged justification for additional compensation *are discovered and/or become known.*" (Emphasis added.) As we have pointed out, there was no justification for additional compensation unless (1) conditions at the actual location were different from those that Affholder expected (*i.e.,* those that

would have been encountered at the bid location) *and* (2) this resulted from a change in location, not from some misjudgment on Affholder's part.

Affholder discovered that the conditions at the tunnel location were different from those it expected soon after beginning work. But it did not know that this resulted from a change in location until the Bob Affholder-Kuhlmann review, a year later.

Southern Rock's case is based on the argument that Affholder *should* have compared the bid drawings with the working drawings when it received the working drawings and *should* then have discovered the change in location, for there is not a scintilla of evidence that any Affholder employee did in fact learn of the change at that time. The notice clause requires notice only from the time the conditions "creating the alleged justification" were "discovered" or became "known." These words imply actual discovery or actual knowledge, not the knowledge that would have been gained had Affholder exercised reasonable care.

While there are a number of Mississippi cases charging a person with the knowledge he would have gained from inquiry after having learned facts that should provoke investigation,[3] none of these interprets specific contract language requiring knowledge to embrace notice that should prompt inquiry.

Southern Rock invokes equitable considerations: had notice been given earlier, it might have sought and obtained the additional compensation from Richland. Now it cannot do so, its claim having been rejected by Lester as untimely. Whether or not Lester's rejection was proper, Southern Rock knew in fact of the change in location and failed to give its subcontractor the benefit of its knowledge. Southern Rock's plight results directly from that failure.

### IV.

██ Southern Rock's final contention regarding the Highway 49 tunnel is that the

---

**3.** *King Lumber Industries v. Cain,* 209 So.2d 844 (Miss.1968); *Crawford v. Brown,* 215 Miss. 489, 61 So.2d 344 (1952); *Stanley v. Stanley,* 201 Miss. 545, 29 So.2d 641 (1947).

district court erred in allowing Affholder to recover the full amount of its actual cost "under the theory of quantum meruit." Mississippi does not permit recovery on a quantum meruit if the claim is based on an "expressed contract."[4] Southern Rock does not contend that this method of computing damage would have been incorrect had there been no contract between the parties, but that, because there was a contract, the "total cost" approach was incorrect.

■ The district court did not rely on quantum meruit alone in calculating Affholder's damages. It found them due in the same amount either "on the theory of ordinary breach of contract" or a breach "of such a substantial nature that it vitiated the contract and permits plaintiff to recover on a *quantum meruit* theory."[5] While it did not discuss the amount of damages, it found, "As a result of the substantially different conditions, Affholder was required to expend the additional sums of money which it proved at trial." Affholder introduced evidence of the retail price of the material used and the actual cost of the work performed, including overhead and profit. Kuhlmann testified in detail about the costs Affholder incurred in constructing the tunnel. Southern Rock had ample opportunity to cross-examine Affholder's witnesses concerning this evidence. Although not compelling, the evidence was sufficient to support the award.

### V.

■ Southern Rock's counterclaim is for damages resulting from Affholder's alleged delay in constructing another tunnel, one beneath a railroad. The subcontract, in a paragraph set forth in full in the footnote,[6] requires Affholder to "prosecute the work diligently and so as to avoid delaying the progress of" Southern Rock. "Should" Affholder "cause delay in the progress or completion of the project," it is liable for Southern Rock's damages.

Southern Rock contends that this imposes liability for delay by Affholder regardless of fault. Affholder reads the two sentences, found in the same paragraph, together and interprets them as exacting damages only if it occasioned delay as a result of its failure to prosecute the work diligently. The district court found that, as to this second tunnel, Affholder had been diligent, a finding not contested by Southern Rock. We are concerned, therefore, only with contract interpretation.

Like the district court, we reject the idea that this paragraph exacts an inexorable but unspecified time limit within which Affholder was required to complete its work. Southern Rock's interpretation would re-

4. *Delta Construction Co. v. City of Jackson*, 198 So.2d 592, 600 (Miss.1967). *See also Citizens National Bank v. L.L. Glascock, Inc.*, 243 So.2d 67 (Miss.1971).

5. The dissent suggests that we are inconsistent in upholding the district court's award on the basis of Southern Rock's breach of contract after finding it unnecessary to decide whether the change in the tunnel's location, without notice, was in fact a breach of the contract by Southern Rock. The breach of contract upon which we premise that holding is Southern Rock's refusal to compensate Affholder for its additional expenses after Affholder submitted its timely notification of its intent to seek such additional compensation. That was a contract breach, whether or not any other breach occurred.

6. 4. Progress and Completion:
Unless herein otherwise specially provided, Subcontractor shall commence work promptly or upon notice from Contractor. Subcontractor shall, in any event, prosecute the work diligently and so as to avoid delaying the progress of Contractor or other subcontractors on other portions of the project work. Subcontractor shall keep and maintain on the project a sufficient number of properly qualified workmen and a sufficient quantity of materials, equipment and supplies to efficiently perform the work as required without delay. Should Subcontractor cause delay in the progress or completion of the project, the damages resulting therefrom, including liquidated damages assessed by Owner and attributable thereto, shall be the obligation of Subcontractor. Contractor shall not be liable to Subcontractor for any delay resulting from the act, neglect or default of the Owner or from causes beyond Contractor's control or, in any case, beyond the granting of justifiable time extensions on written applications therefor made within 48 hours from the beginning of the claimed delay.

quire Affholder to finish all of its work by an unknown time: a time that would not delay Southern Rock. It would exact damages if Affholder were ever so scrupulous and was itself delayed by acts of God or other causes beyond its own control. No authority is cited for this fanciful interpretation. We cite none in rejecting it.

For these reasons, the judgment is AFFIRMED.

CLARK, Chief Judge, dissenting:

It is a fundamental of all contract law, not just that of Mississippi which is applicable in this diversity case, that "[c]ourts do not have the power to make contracts where none exist, nor to modify, add to, or subtract from the terms of one in existence." *Citizens National Bank of Meridian v. L.L. Glascock, Inc.*, 243 So.2d 67, 70 (Miss.1971). The majority opinion, proceeding from an untenable factual basis and without citation of any precedent in support of its analysis, changes the contractual relationship adopted by the contractor and subcontractor here. The result works an injustice in this case and surely will prove damaging to the stability of traditional business relations among those engaged in the performance of public works in Mississippi.

The record clearly shows that Affholder gambled with uncertainty in bidding for this job by speculating about subsurface conditions that would be encountered at the very "bid" site it so strongly relies on. When it made the bid, Affholder did not know whether its speculations about working conditions were overly optimistic or not. Even now Affholder does not know what the conditions actually would have been, or at least the record does not establish it knew the facts. There is no legal basis for shifting to Southern Rock this calculated risk that Affholder knowingly assumed.

The district court committed error (which the majority opinion affirms) in substituting Affholder's speculations about engineering facts, whereby Affholder assumed the risk of loss at the "bid" site, for reli-able engineering facts. The district court stood on its head the contract-defined relations of contractor and subcontractor. It compounded this legal error with a conclusory finding, unsupported by the record, that subsurface conditions at the "bid" site were "vastly different" from those at the actual work site.

It is undisputed that there were two critical aspects to tunnelling conditions: (1) the water level at the site; and (2) the elevation of Yazoo clay there. The record contains no evidence about the water level at the "bid" site in 1976. Mr. Affholder testified that during the first, aborted bidding process in 1975, he had observed pump tests made by other parties and had deduced from those observations how extensive a dewatering system would be required. That is the only evidence to indicate the water level. The record reveals, however, that this 1975 test was 45 to 50 feet removed from Affholder's 1976 bid site. (R–III, p. 205). Moreover, the test took place over a year prior to the bidding. It is undisputed among the parties that this area in Mississippi is "famous for fluctuations of the water table" and that testing prior to bidding is critical. Yet Affholder conceded at trial that neither observations nor tests of the water level were made at the "bid" site. Kuhlmann, Affholder's area manager, conceded at trial that he "didn't know how much water was going to be in the sand" when the bid was made. (R. II, p. 95).

Likewise, the record does not support the conclusion that the tunnel would have been entirely in clay at the "bid" location. Affholder made a test boring only on the east side of the highway, five to ten feet off the shoulder. Obviously the tunnel had to pass from one side of the highway to the other. Without evidence of the clay elevation on the west side, there is no way to know if the tunnel would have been entirely in clay at the "bid" site.

Kuhlmann testified that their estimate of the clay elevation on the west side was only a "guess." (R. II, p. 109). As the district court noted, this area is "famous ... for

differences in elevation of the clay." As the elaborate mathematical computations demonstrate, a misjudgment in the clay elevation by a matter of inches may make a great difference in the cost of construction of this sewer system tunnel. This critical engineering fact is not susceptible of proof by guesses and hunches. It admits of no gray area. The clay elevation was either just high enough or it was not. Furthermore, the reliability of Affholder's and Kuhlmann's guesses are called into question when one considers that they misinterpreted their own boring to show clay at thirty-three feet, yet now concede that the test log reveals clay at thirty-four and a half feet. Likewise, these "experts" were not even able to recognize that they were working at a site 150 feet farther along the highway than where they had exercised their expertise only a few months earlier [*] or to realize that "vastly different" working conditions immediately encountered were related to a change in the work site.

Because there is no reliable proof of the elevation of clay on the west side of the highway, there is no basis for the district court's conclusion that the tunnel would have been built entirely in clay at the "bid" location.

The district court, without reference to the actual contract language, decided that Southern Rock breached an implied condition of the subcontract when it submitted to Affholder, "without notice," the revised working drawings which clearly showed to anyone proficient in the construction industry that the tunnel was to be constructed 150 feet north of the location indicated on the bid drawings. The majority opinion, apparently realizing that the district court's reasoning is untenable in light of the express contract language, declines to reach the issue. I pause briefly to note that the district court erred in this regard on several counts.

The subcontract between Southern Rock and Affholder explicitly incorporated the "terms, conditions, specifications, *drawings*, schedules and contract documents forming a part of the Original Contract between Contractor and Owner" (emphasis added). Affholder agreed to "complete the work in strict compliance with the terms of the Original Contract ...." Hence, Affholder bound itself to Southern Rock by the terms of the original contract by which Southern Rock bound itself to the owner, unless the terms were inconsistent with the subcontract or unless the subcontract contained words of definite limitation. *See Perry v. United States*, 146 F.2d 398, 400 (5th Cir.1945); *Hill & Combs v. First National Bank of San Angelo*, 139 F.2d 740 (5th Cir.1944). The terms were not inconsistent, and the subcontract contained no germane limiting language.

Nothing in the original contract supports finding an implied condition that the tunnel eventually would be constructed at exactly the location shown on the bid drawings.

[*] The majority opinion suggests that the change in location was not easily observable because, although there were two cleared rights of way visible when Southern Rock began work on August 2, the whole area "apparently" had been cleared when Affholder began work on September 22. Aside from the obvious fact that it was Affholder's choice not to familiarize itself until September 22 with the work it bid, the record belies the suggestion that no landmarks were visible. Kuhlmann testified that he in fact visited the actual site on August 31 and witnessed the work being performed by Southern Rock. He testified that he did not see any evidence of the previous boring he had taken. (R. II, p. 101). Mr. Lester, the engineer, testified that he visited the work site after receiving correspondence in October about the change in the location of the tunnel. (R. III, p. 362). He testified that the old and new sites were clearly visible: "there is the old stake 150 feet down the road and here is the new installation all laid out, staked out with new stakes and all of that.... [T]he old stakes become grey and aged and the new stakes that we put in there to build it by were new white pine stakes and you can tell, those of us engaged in this kind of work, we can tell whether it is an old line or a new line." (R. III, p. 367). Furthermore, Mr. Lester testified that the terrains were different at the two sites: "[T]he terrain where the tunnel finally went in had a bog and a pond that began some—I'm guessing, fifty or seventy-five feet west of the end of the tunnel. Whereas, the terrain where the old installation was did not have such a bog." (R. III, p. 371). The particulars of this testimony are undisputed in the record.

The contract advised that working drawings would be issued as work progressed (Div. II, § A–04), that these supplementary drawings were an integral part of the contract (Div. II, § A–03), and advised Affholder to check the drawings carefully (Div. II, § A–04). Affholder was as bound to Southern Rock to construct the tunnel at the site shown on the engineer's working drawings as Southern Rock was bound to the owner to construct it there. The "bid" site was only a point of reference if some timely claim of cost of change was to be raised.

The contract explicitly reserved Richland's right to increase or decrease the scope of work as necessary or desirable. (Div. I, § M–03). The contract provided a method whereby Affholder could, with advance authorization, procure additional compensation if the changes necessitated work not adequately reflected in the bid. (Div. I, § M–03).

There is no doubt that these provisions by which Richland reserved the right to alter the scope of the work and by which Affholder assumed the burden to seek advance authorization for additional compensation are valid and that these unambiguous provisions as read literally must be enforced. *Cf. Jackson v. Sam Finley, Inc.,* 366 F.2d 148 (5th Cir.1966) (street-paving contract with City of Meridian, Mississippi, that provided for changes in the scope of work to be performed was valid and not breached by the city's cutbacks in the project, even though the cutbacks radically altered the nature of the performance upon which the subcontractor had based its bid). Because there was no implicit condition that the "bid" location be invariable, there was no breach. Affholder was notified of the change in the location of the work in the manner that the contract provided.

The majority opinion seeks to dissociate itself from the district court's error by declining to reach the issue of contractual breach, instead holding that "even if the contract terms govern, Affholder's notice [to Southern Rock of increased costs due to changed conditions] was timely." The majority opinion states: "There was no justification for additional compensation unless (1) conditions at the actual location were different from those that Affholder expected (*i.e.,* those that would have been encountered at the "bid" location) *and* (2) this resulted from a change in location, not from some misjudgment on Affholder's part." The opinion concludes that notice was timely, since Affholder did not "know" until its work was finished that the changed conditions resulted from a changed location.

The majority opinion fails to discuss the fact that the original contract separately provides for additional compensation for two types of events. Under one set of provisions, the contract provides additional compensation for extra expenses arising out of changes made by the owner in the scope of the work required (*i.e.,* "extras") and for items inadvertently omitted from the original bid estimate (*i.e.,* "work not covered"). (Div. I, §§ M–03, M–05). Such additional compensation must be authorized before the contractor proceeds with the work. (Div. I, § M–05).

The additional compensation provision quoted by the majority opinion appears in a separate section of the contract and states in full:

Any request by the Contractor for additional compensation, *other than that compensation provided under the terms of the Contract, such as claims for extras, claims for work not covered, etc.,* shall be submitted to the Owner, through the Engineer, within thirty (30) days after the condition or conditions creating the alleged justification for additional compensation are discovered and/or become known to the Contractor.

Any incidents or conditions discovered by the Engineer by which additional compensation may be in order shall be deemed as "known to the Contractor" upon written notice to the Contractor by the Engineer of such incident or condition.

Failure of the Contractor to submit a claim for additional compensation during

the thirty (30) day period herein provided shall be considered as a waiver of all rights to additional compensation and no additional compensation will be allowed for any reason connected therewith.

(Div. I, § N–08) (emphasis added).

When the first set of provisions for additional compensation is read in conjunction with this latter provision, the contractual framework is clear: Affholder was entitled to seek additional compensation for (1) alterations in the scope of the work made by Richland, or (2) discovery of conditions that differed from those contemplated in the bid. The majority opinion confuses the notice requirements for additional compensation under the two sets of provisions. Under the latter set of provisions, Affholder was entitled to seek additional compensation for extra work resulting from unexpected conditions, independent of any knowledge or discovery of changes Richland had made in the scope of the work, and regardless of whether Affholder's failure to anticipate the conditions actually encountered resulted from its own misjudgment, from fluctuations in pre-existing conditions, or from a shift in the location.

It is undisputed that Affholder encountered and recognized unexpected conditions within days of beginning its work. Under the terms of the contract, its conscious decision to grit its teeth and absorb the extra costs resulting from unexpected conditions constituted a waiver of its rights for additional compensation. As Southern Rock complains, Affholder never gave notice of the unexpected conditions, causing Southern Rock to be barred from recovering additional compensation from Richland. Southern Rock had no duty to tell Affholder a fact plainly disclosed by the contract drawings Affholder agreed would govern its work. Southern Rock should not be penalized for Affholder's disregard of Affholder's own contractual obligations.

Nor was Affholder's request for additional compensation timely under those provisions relating to "extras" and "items not covered." Those provisions contain no 30-day asking period, but required Affholder to seek additional compensation before performing the work. In *Delta Construction Co. v. City of Jackson*, 198 So.2d 592, 600 (Miss.1967), the Mississippi court endorsed such prior-approval requirements in municipal contracts:

The contract in the instant case requiring a supplemental agreement for extra work over minor changes is essential, because municipalities and other governmental agencies obtain funds with which to build public improvements from bond issues based upon estimates furnished to them, and municipalities must reserve the right to stop a project if they determine the extra work will exceed the amount of money allocated to any given phase of a project.

Apart from its patent misconstruction of the contract, the majority opinion contains an internal inconsistency. While declining to address the district court's untenable conclusion that Southern Rock breached the subcontract, the majority opinion nevertheless affirms the lower court's award of damages based upon *quantum meruit* and contractual breach, rather than upon the express terms of the contract. To reach such a result, the majority opinion must assume that Southern Rock breached its contractual obligation with respect to Affholder's request for additional compensation. Implicit in this assumption, however, is the issue that the majority opinion fails to reach, namely whether Southern Rock breached any duty to notify Affholder of changes in the working drawings. Under the contract, a change in the location did not entitle Southern Rock automatically to additional compensation. Accordingly, Southern Rock's failure automatically to honor such a request is not in and of itself a contractual breach, and provides no basis for awarding damages. Moreover, as discussed above, Affholder's request for additional compensation was in fact not timely. Premised on unexplored and unfounded assumptions, while yielding only fleeting and superficial attention to the unambiguous contract provisions that resolve this dispute, the result of the majority opinion is unjust and contravenes Mississippi law. *See Delta Construction Co. v. City of Jackson*, 198 So.2d 592, 600 (Miss.1967).

For all of these reasons, I respectfully dissent.

## ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, RUBIN and POLITZ, Circuit Judges.

PER CURIAM:

The Petition for Rehearing is DENIED and no member of this panel nor Judge in regular active service on the Court having

requested that the Court be polled on rehearing en banc (Federal Rules of Appellate Procedure and Local Rule 35), the Suggestion for Rehearing En Banc is DENIED.

CLARK, Chief Judge, dissents from the refusal of the court to grant rehearing and rehearing en banc for the reasons stated in the dissent to the panel opinion dated July 2, 1984.